UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DIANNE DAVENPORT,<br>    Plaintiff, | :<br>:<br>: |
| v. | :    3:07cv805 WWE |
| NORWALK BOARD OF EDUCATION,<br>    Defendant. | :<br>:<br>: |

## MEMORANDUM OF DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Dianne Davenport filed this nine count action against defendant Norwalk Board of Education ("the Board") alleging: (1) discrimination, (2) retaliation and (3) termination based on age in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), CONN. GEN. STAT. § 46A-60 *et seq*.; (4) discrimination, (5) retaliation and (6) termination based on age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621-634; (7) discrimination and (8) termination based on disability in violation of the Americans with Disability Act ("ADA"), 42 U.S.C. § 12101 *et seq*.; and (9) termination based on disability in violation of CFEPA, CONN. GEN. STAT. § 46A-60 *et seq*.  Defendant has moved for summary judgment.  For the following reasons, defendant's motion for summary judgment will be granted in part and denied in part.

## BACKGROUND

Plaintiff began her employment with defendant in 1970 as a full-time elementary school teacher at McGrath Elementary School.  Defendant employed plaintiff as a teacher for 37 years.  Prior to 2003, plaintiff received high teacher-performance ratings.  Plaintiff also cited anecdotal evidence of her success as a teacher, such as her nomination by a parent for the DisneyHand

1

Teacher Award. In 2000, at age 51, plaintiff allegedly began to observe unjustified criticism by then school principal, Patricia Dielman, of teachers and staff eligible for retirement. Plaintiff claims that Mildred Trowbridge, Frances Middleton, and Leo Millbanks, all approximately 60 years of age, were bullied into retirement by Dielman. In 2003, the assistant principal, Julianne Ross, began making allegedly false complaints about plaintiff's lesson plans. Ross also reprimanded plaintiff for being one day late in submitting a teacher project. Shortly thereafter, Ross conducted an in-class observation of plaintiff and rated plaintiff as "basic" in one of the four grading categories. Plaintiff cannot recall ever previously receiving the low rating.

Myrna Tortorello became the new Principal in the fall of 2004. Plaintiff allegedly witnessed Tortorello "personally and actively harass, intimidate, embarrass and humiliate at least three other persons over the age of 40 . . . ." Plaintiff alleges that Tortorello demonstrated a pattern of shaming and humiliating older employees with the goal of inducing the employees to leave their jobs.

Tortorello first formally observed plaintiff in October, 2004. Plaintiff contends that the class went extremely well. However, Tortorello pronounced that the observation was tarnished by plaintiff's references to Tortorello's presence in the classroom. Plaintiff professes that any references to Tortorello's presence were limited and immaterial, and that Tortorello was looking for excuses to criticize plaintiff. Nonetheless, the initial observation was disqualified.

Before observation, plaintiff was required to submit a lesson plan for approval. Lesson plans take several hours to devise and another few hours to write and prepare. While the plan for the October observation had been reviewed and approved, Tortorello repeatedly rejected lesson plans for the makeup observation. Plaintiff was informed of the rejections via notes in her school

2

mailbox.  The notes instructed plaintiff to resubmit her plan the following day after making the necessary corrections.  Tortorello rejected plaintiff's first four attempts at makeup plans and criticized plaintiff for failure to comply with her directives.  Plaintiff claims that her lesson plans were objectively equivalent to plans approved for other teachers.  Plaintiff alleges that Tortorello openly and publicly mocked plaintiff's inability to write a lesson plan.  Tortorello suggested that plaintiff meet with a younger teacher to "see how it is done."  Plaintiff alleges that when she showed her rejected plans to the younger teacher, he couldn't believe that they had been rejected.  Tortorello again rejected plaintiff's lesson plan when it wasn't on the current, brand new form devised for evaluations.  Finally, around the same time, Tortello added documents to plaintiff's file which allegedly falsely portrayed plaintiff as being ignorant of her students' reading levels.

  Plaintiff claims that the verbal and written "assaults" on her capabilities and the certainty of the rejection of her lesson plan submissions became overwhelming.  Plaintiff experienced anxiety, depression, difficulty sleeping, and weight loss.

  Normally, teachers complete their observed lesson in the fall.  On April 6, 2005, Tortorello delivered another rejection letter to plaintiff's school mailbox.  The letter directed plaintiff to submit a revised lesson plan by the following morning.  Plaintiff claims she was so despondent that she could not function.  Plaintiff stayed in bed the following day rather than going to work.  Upon returning to work on April 8, Tortorello allegedly accosted plaintiff in the hallway.  Tortorello demanded an acceptable lesson plan.  Feeling faint, plaintiff left school to seek medical attention at Yale New Haven Hospital.

  Treatment reports from the hospital cited work-related stress as the cause of plaintiff's anxiety.  Plaintiff forwarded the reports to defendant and advised that she would be taking a

prolonged absence.  Plaintiff also engaged an attorney to begin the process of filing a complaint with the Commission on Human Rights and Opportunities ("CHRO").

Meanwhile, Tortorello implemented a "focused assistance" program for plaintiff.  Plaintiff believed the bases for the disciplinary assistance were fabricated, so she filed a second CHRO complaint to address the false critiques.  Plaintiff also transferred to Wolfpit, another school of the defendant, to teach fourth grade.  During the relocation process, plaintiff was contacted by the president of her teacher's union, Bruce Mellion.  He allegedly told plaintiff that she was never going to be able to teach until her desired retirement age of 65.  Plaintiff claims that Mellion actively solicits teachers to retire so that they may be replaced by younger teachers at a lower cost to defendant.

As the new school year started, plaintiff continued to miss work because of her anxiety.  Upon arrival at Wolfpit, the principal there, Frances Mahoney, allegedly told plaintiff, "Don't think I am going to forget what happened at Marvin."[1]  Mahoney placed plaintiff on "focused assistance" for the entire school year.  Plaintiff claims that focused assistance is, by design, only meant to last a few weeks.

The focused assistance program was new, and plaintiff was the first teacher enrolled.  Plaintiff asserts that she complied with the conditions of the plan, spending hours each day in addition to the customary, full-time work of a teacher.  The plan included formal observations by Mahoney and others.  While plaintiff believed that the observations went well, Mahoney denied plaintiff proficiency ratings in most of the graded categories.  Plaintiff believes that defendant purposely failed her to force her into an intervention program.

---

[1] Plaintiff transferred from Marvin Elementary School.

Plaintiff was placed into an intervention program which further increased her workload. She began to believe that no level of performance would restore her to her regular teaching status. Defendant continued to report plaintiff as inept and plaintiff's file accumulated negative feedback. Plaintiff denies most of her alleged failures as a teacher.

Finally, in 2007, defendant notified plaintiff of her termination hearing. Defendant removed plaintiff from her classroom, stripped her of her teaching responsibilities and reassigned her to work at the Board of Education central offices. Plaintiff's psychologist recommended against fighting her termination for health reasons. Plaintiff elected to retire instead of going forward with the hearing. After obtaining a release from CHRO, plaintiff filed this nine count claim.

## **DISCUSSION**

A motion for summary judgment must be granted if the pleadings, discovery materials before the court and any affidavits show that there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A dispute regarding a material fact is genuine if there is sufficient evidence that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. Am. Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981).

If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate.

Celotex Corp., 477 U.S. at 323.  If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met.  Liberty Lobby, 477 U.S. at 24.  The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient; there must be evidence on which the jury could reasonably find for him.  See Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the court resolves all ambiguities and draws all permissible factual inferences in favor of the nonmoving party.  See Patterson v. County of Oneida, 375 F.3d 206, 218 (2d Cir. 2004).  If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper.  See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004).

**Age Discrimination based on Discipline (Counts 1, 4)**

Plaintiff claims that she was discriminated against because of her age in violation of CFEPA, CONN. GEN. STAT. § 46A-60 *et seq.*, and ADEA, 29 U.S.C. § 621-634.  Discrimination claims are assessed under the familiar burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).  Under McDonnell Douglas, the plaintiff must first establish a *prima facie* case of discrimination by showing that (1) she belongs to a protected class; (2) she was performing her duties satisfactorily; (3) she suffered adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.  See Hongyan Lu v. Chase Inv. Services Corp, 412 Fed. Appx. 413, 415 (2d Cir. 2011).  Once the plaintiff has established a *prima facie* showing of

discrimination, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employment action." McDonnell Douglas, 411 U.S. at 802. Once the defendant proffers a legitimate, nondiscriminatory reason for the challenged action, "the presumption of discrimination arising with the establishment of the *prima facie* case drops from the picture." Hongyan Lu, 412 Fed. Appx. at 415 (quoting Weinstock v. Columbia Univ., 224 F.3d 22, 42 (2d Cir. 2000). The burden then shifts back to the plaintiff to "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination. Id.

Plaintiff has established a *prima facie* case. As to prong one, plaintiff was at all relevant times over the age of 40 and, therefore, belongs to a protected class. Further, plaintiff maintains that she performed her duties satisfactorily and that her poor performance reviews were a pretext for her removal. While defendant strongly argues that plaintiff underperformed, plaintiff's job performance remains a genuine issue of material fact. Generally, an adverse employment action is comprised of "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished responsibilities, or other indices . . . unique to a particular situation." Loris v. Moore, 2008 WL 3891730 *10 (D. Conn. Aug. 20, 2008). Plaintiff suffered adverse employment action when she was stripped of her teaching responsibilities and removed from the classroom.

Plaintiff alleges that defendant engaged in a pattern of bullying older employees also belonging to her protected class. Plaintiff claims to have personally witnessed systematic targeting of older teachers. In other words, younger teachers received more favorable treatment. Some of the older teachers elected to transfer or retire rather than bear the hostility.

When viewed in the light most favorable to plaintiff, these claims describe a practice of purposeful disparate treatment of protected persons by defendant that give rise to an inference of pretext strong enough to withstand the motion for summary judgment.  Therefore, defendant's motion for summary judgment is denied with respect to the age discrimination counts.

**Retaliation (Counts 2, 5)**

In counts two and five of her first amended complaint, plaintiff alleges that she was retaliated against by the Board, in violation of FEPA and the ADEA, for opposing age discrimination.  Retaliation claims brought under FEPA and the ADEA are both analyzed under the McDonell-Douglas burden-shifting framework described above.  A plaintiff seeking to make out a retaliation claim must initially show the following: (1) that she engaged in a protected activity; (2) that her employer was aware of this activity; (3) that the employer took adverse employment action against her; and (4) that a causal connection exists between the alleged adverse action and the protected activity.

Plaintiff alleges that defendant stepped up its disciplinary proceedings in response to her CHRO complaints against defendant.  Plaintiff's complaints constitute protected activity of which defendant was aware.  As discussed above, defendant took adverse employment action against plaintiff when it stripped her of her teaching duties.  Thus, only the fourth element, existence of a causal connection, remains.  Defendant argues that increased discipline was triggered solely by plaintiff's continued under-performance.  Plaintiff maintains that her teaching was objectively proficient.  Moreover, defendant's disciplinary actions against plaintiff, namely, the "focused assistance" program, had never before been implemented.  Ultimately, the motivation of defendant is an issue of credibility.  When viewed in the light most favorable to

plaintiff, a jury could reasonably find in her favor.  Therefore, defendant's motion for summary judgment is denied with respect to the age retaliation counts.

### Age Discrimination based on Termination (Counts 3, 6)

Plaintiff alleges that her termination violates the ADEA and CFEPA.  To establish a *prima facie* case of discriminatory termination, plaintiff must show that (1) at the time termination she was at least 40 years of age, (2) her job performance was satisfactory, (3) she was terminated, and (4) her termination occurred under circumstances giving rise to an inference of age discrimination.  Choate v. Transport Logistics Corp., 234 F. Supp. 2d 125, 128-29 (D. Conn. 2002).  As discussed above, plaintiff has met her burden with respect to elements (1), (2), and (4).  Only the termination element remains.

Defendant argues that plaintiff's termination claims can't survive because plaintiff retired of her own volition.  However, plaintiff does not claim direct termination.  Rather, the complaint and moving papers allege constructive discharge: "As the result of the Board of Education's refusal to reschedule the termination proceedings, Plaintiff was left with no other options but to retire as she could not endure the adversarial proceedings at the time . . . ."  Dr. Begun, plaintiff's psychologist, submitted that defendant's long-term harassment of plaintiff caused plaintiff to experience major depressive disorder and heart trouble.  Plaintiff argues that she was forced to resign to relieve the enormity of her depression and anxiety when termination proceedings could not be postponed.

Defendant contends, "[p]laintiff must show that the employer deliberately made [plaintiff's] working conditions so intolerable that [she] was forced into involuntary resignation." Stetson v. NYNEX Service Co., 995 F.2d 355, 360 (2d Cir. 1993).  Defendant argues this

threshold has not been met. However, plaintiff has alleged that defendant intentionally created the intolerable atmosphere to force older employees out. Viewed in the light most favorable to plaintiff, considering the severity of her doctor's warning that termination proceedings could aggravate both her depression and heart problems, plaintiff's retirement could reasonably be viewed as constructive discharge. Therefore, defendant's motion for summary judgment is denied with respect to the age termination counts.

### Discrimination and Termination based on Disability (Counts 7, 8, 9)

To make out a *prima facie* discrimination claim pursuant to the ADA, plaintiff must establish that: (1) her employer is subject to the ADA; (2) she was disabled within the meaning of the ADA; (3) she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) she suffered adverse employment action because of her disability. Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir. 2001).

Under the ADA a "disability" is defined as:

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
(B) a record of such an impairment; or
(C) being regarded as having such an impairment.

Plaintiff has failed to identify any disability that substantially limited her ability to perform a major life activity within the meaning of the ADA.

The statutory definition of a physically disabled person, for purposes of the CFEPA, is: "any individual who has any chronic physical handicap, infirmity or impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illness . . ." Conn. Gen. Stat. § 46a-51(15). Again, plaintiff has failed to sufficiently allege a chronic impairment.

Furthermore, plaintiff failed to respond to defendant's summary judgment motion with respect to any of the disability counts. While depression, anxiety, and heart problems may be generally described as impairments, they do not necessarily qualify an individual as disabled within the meaning of the ADA or CFEPA. As plaintiff has failed to establish a *prima facie* claim of disability, defendant's motion for summary judgment is granted with respect to the disability counts.

## **CONCLUSION**

Fore the foregoing reasons, defendant's motion for summary judgment is GRANTED in part and DENIED in part. With respect to the age discrimination, retaliation, and termination counts, (1 - 6), defendant's motion for summary judgment is DENIED. With respect to the disability counts, (7 - 9), defendant's motion for summary judgment is GRANTED.

Dated this 28th day of March, 2012 at Bridgeport, Connecticut.

_____/s/_____
WARREN W. EGINTON
SENIOR UNITED STATES DISTRICT JUDGE